UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SALVADOR BURGOS,

                              Plaintiff,                    <u>DECISION & ORDER</u>

                                                           15-CV-6420P

               v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____


## <u>PRELIMINARY STATEMENT</u>

Plaintiff Salvador Burgos ("Burgos") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 6).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 11, 13).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Burgos's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.    Procedural Background

Burgos protectively filed for SSI on November 19, 2012, alleging disability beginning on November 14, 2011, due to paranoid schizophrenia, depression, and mood swings. (Tr. 156, 170).[1]  On March 20, 2013, the Social Security Administration denied Burgos's claim for benefits, finding that he was not disabled.[2]  (Tr. 85).  Burgos requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 100-01, 111-15). The ALJ conducted a hearing on October 21, 2014.  (Tr. 45-74).  Burgos was represented at his hearing by his attorney Justin Goldstein, Esq.  (Tr. 45, 86).  In a decision dated November 24, 2014, the ALJ found that Burgos was not disabled and was not entitled to benefits.  (Tr. 27-41).

On May 22, 2015, the Appeals Council denied Burgos's request for review of the ALJ's decision.  (Tr. 1-7).  Burgos commenced this action on July 17, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

## II.    Relevant Evidence[3]

### A.    Educational Records

Records from the Rochester City School District suggest that Burgos exhibited academic difficulties.  (Tr. 326-29).  He was evaluated for intervention in early 1988, while repeating the first grade.  (*Id.*).  His evaluator noted that his dominant language was not English and that he had spent much of his youth in Puerto Rico.  (*Id.*).  His evaluator also noted that Burgos's father had been murdered the previous year and that Burgos had witnessed the incident.

---

[1]   The administrative transcript shall be referred to as "Tr. __."

[2]   Burgos's previous application for benefits was denied on December 13, 2011.  (Tr. 157).

[3]   Those portions of the treatment records that are relevant to this decision are recounted herein.

(*Id.*).  According to the evaluator, Burgos's behavior in the classroom was aggressive, disruptive, destructive, and withdrawn.  (*Id.*).  Burgos lived with his grandmother, who also provided care to two of Burgos's younger cousins.  (*Id.*).

The WISC-R was administered to Burgos in April 1988 and demonstrated that he had a verbal intelligence quotient ("IQ") of 73, a performance IQ of 104, and a full scale IQ of 86.  (Tr. 347).  According to the report, his intellectual potential ranged between borderline (verbal) and average (performance) and there was a twenty-seven point discrepancy between the two scales.  (Tr. 355).  Burgos's teachers reported that he did not know the alphabet and he confused colors and numbers.  (*Id.*).  Burgos was classified as learning disabled, placed into special education, and provided English for Speakers of Other Languages ("ESOL") services. (Tr. 344, 399).

Burgos's education records suggest that he continued to struggle academically, particularly with reading and math.  (Tr. 403, 437).  He also continued to exhibit behavioral problems, including aggression with his peers.  (Tr. 404).  He was assessed to be insecure and anxious, and to have poor tolerance for frustration.  (Tr. 436).  In 1990, Burgos's Individualized Education Plan ("IEP") was reviewed, and Burgos was determined to need more individual attention.  (Tr. 494).  He continued to be classified as learning disabled and was placed into an Option II special education classroom.  (*Id.*).  At that time, Burgos was assessed to be fluent in English, and his language services were terminated.  (*Id.*).

Burgos was eventually moved to an Option III classroom with a 6:1:1 student to adult ratio, due to his weak academic skills.  (Tr. 592, 688).  At thirteen, Burgos was still unable to read.  (Tr. 592, 630).  In 1994, Burgos received a long-term suspension from school after having been found guilty of willfully assaulting a staff member.  (Tr. 721).  As a result, he was

placed into the BOCES Harris Green program and received home instruction. (Tr. 737). In 1995, Burgos was placed into programming that contained a vocational component and a classroom with a 12:1+1 student to adult ratio. (Tr. 829-30).

In April 1995, a psychological evaluation was administered to Burgos. (Tr. 837-38). The WISC-III was administered, and Burgos demonstrated a verbal IQ of 64, a performance IQ of 89, and a full scale IQ of 74. By 1995, at the age of fifteen, Burgos was assessed to have reading and writing skills at a first grade level and math skills at a third grade level. (Tr. 885).

### B. **Medical Records**

#### 1. **Anthony L. Jordan Health Center**

Treatment notes indicate that Burgos received treatment from providers at Anthony L. Jordan Health Center beginning on March 3, 2010. (Tr. 239-40). On that date, he attended an appointment with Roger Joseph Chapman ("Chapman"), PA. (*Id.*). Burgos reported that he suffered from schizophrenia and had previously received treatment at Evelyn Brandon Health Center and wanted to reengage in treatment. (*Id.*). Burgos reported that he was not currently hearing voices, although he was currently using cocaine and marijuana on a daily basis. (*Id.*). Chapman referred Burgos for mental health treatment. (*Id.*).

On October 9, 2012, Burgos attended an appointment with Walter Beecher ("Beecher"), MD, in order to undergo a physical examination necessary to permit him to participate in a chemical dependency program. (Tr. 236-27). Burgos reported that he had been started on Seroquel and had been discontinued from a chemical dependency program for frequent marijuana use. (*Id.*). He was attempting to enroll in a mental health day treatment

program.  (*Id.*).  Beecher noted that Burgos was stable on Seroquel and that he appeared

generally healthy.  (*Id.*).  He ordered laboratory work.  (*Id.*).

On November 20, 2012, Burgos returned for a follow-up appointment with

Beecher to review the results of blood work.  (Tr. 233-35).  Burgos reported that he was doing

well with his mental health treatment and that his dosage of Seroquel had been increased.  (*Id.*).

Burgos also complained of a rash, which was examined and treated by Beecher.  (*Id.*).

On July 2, 2013, Burgos attended an appointment with Beecher and requested that

he complete paperwork relating to his claim for benefits.  (Tr. 250-51).  Burgos reported ongoing

mental health treatment and that he was regularly attending his appointments.  (*Id.*).  Burgos

reported that he had a new significant other.  (*Id.*).  Beecher noted that Burgos did not leave the

form for him to complete, although he noted that it would likely be "reasonable to exclude from

work requirement at present."  (*Id.*).

## 2.  **Evelyn Brandon Health Center**

On October 24, 2012, Burgos had a mental health evaluation with Stephanie

Catlin-Rakoski ("Catlin-Rakoski"), MS, MHC.  (Tr. 214-31).  Burgos reported that he was born

in Puerto Rico and moved to Rochester, New York, at age six, after his father was killed.  (*Id.*).

According to Burgos, he did not have extensive supervision as a child and was the "man of the

house" after his father's death.  (*Id.*).  Burgos reported that he lived with his mother and

grandparents as a child.  (*Id.*).  Burgos was "on the street often" and was in foster care at age

eleven.  (*Id.*).  His grandfather passed away when he was fourteen.  (*Id.*).

Burgos had four siblings, but remained close with only one of his sisters.  (*Id.*).

He indicated that he saw his mother approximately once a month, but that they were not very

close.  (*Id.*).  According to Burgos, it was difficult for him to be around his family and he would

typically "smoke" before seeing them in order to calm himself.  (*Id.*).  Burgos reported that he

had one seventeen-year-old daughter and two stepchildren.  (*Id.*).  He had been dating his

girlfriend, who was a recovering alcoholic, for the previous fifteen months.  (*Id.*).

      Burgos reported being in and out of juvenile detention for burglaries.  (*Id.*).  In

1997, at age sixteen, Burgos shot and killed his ex-girlfriend's boyfriend, and he was

subsequently incarcerated for approximately nine years.  (*Id.*).  At the time, he was in the eighth

grade in a BOCES program.  (*Id.*).  He reported reading and writing difficulties and indicated

that he was able to read at a third grade level.  (*Id.*).  While he was incarcerated, Burgos was

diagnosed with paranoid schizophrenia.  (*Id.*).  Burgos was released in approximately 2006.

(*Id.*).  Burgos reported previous employment in 2003 as a dishwasher.  (*Id.*).  According to

Burgos, he had been terminated from most of his previous jobs due to his temper.  (*Id.*).

      At the time of the evaluation, Burgos was participating in a chemical dependency

program at Evelyn Brandon Health Center and had requested a referral for mental health

treatment.  (*Id.*).  According to Burgos, he stopped using cocaine in January 2012 and marijuana

in October 2012.  (*Id.*).  He reported that he began experiencing auditory hallucinations at

twenty-one, but did not experience hallucinations when on medication.  (*Id.*).  According to

Burgos, the hallucinations occurred approximately once every two months and involved voices

commanding him to harm others.  (*Id.*).  Burgos reportedly isolated himself to avoid harm to

others and had cut himself in June 2011 in order to avoid harming anyone else.  (*Id.*).  Burgos

reported that he had previously been prescribed Seroquel and Zyprexa, which were effective.

(*Id.*).

      Burgos reported temper and anger issues and that he had physically harmed his

girlfriend approximately eight months earlier, which had resulted in her hospitalization.  (*Id.*).

He reported that he smoked marijuana in order to calm himself. (*Id.*). Burgos endorsed social isolation, paranoia, nightmares, flashbacks, excessive worry, and panic attacks. (*Id.*). He had previously received outpatient mental health treatment between 2006 and 2009. (*Id.*).

Upon observation, Burgos presented logical and coherent thought form, average eye contact, normal speech, guilty, helpless and worthless thought processes, normal perceptions, euthymic mood, normal range affect, no apparent cognitive deficit, full orientation, and good insight and judgment. (*Id.*). Catlin-Rakoski noted that Burgos had been evaluated by a psychiatrist, Dr. Reddy ("Reddy"), and had been prescribed Seroquel. (*Id.*). Burgos reported that the medication alleviated his auditory hallucinations unless he was very stressed or overwhelmed. (*Id.*). Catlin-Rakoski noted that Burgos was unable to read or write and that he expressed interest in attending an anger management group. (*Id.*). She assessed that he suffered from Post-Traumatic Stress Disorder ("PTSD"), rule out schizophrenia, paranoid type. (*Id.*).

On November 2, 2012, Burgos attended a therapy session with Catlin-Rakoski. (Tr. 210-13). Burgos was on time and demonstrated appropriate attire, unremarkable motor behavior, intermittent eye contact, normal speech, logical, coherent and vague thought forms, hopeless and worthless thought processes, normal perceptions, anxious and irritable mood, normal range affect, distractible cognition, full orientation, and good insight and judgment. (*Id.*). Burgos endorsed seeing shadows and hearing voices at times, although Catlin-Rakoski believed that his description suggested that the voices were actually his own thoughts. (*Id.*). According to Burgos, the voices occurred when he was angry or anxious and involved paranoia about others harming him, which caused him to want to harm others. (*Id.*). To avoid acting on his thoughts, Burgos reportedly isolated himself. (*Id.*). Burgos became defensive and agitated when

Catlin-Rakoski related his symptoms to PTSD, which caused Burgos's conversation to become vague, tangential, and defensive. (*Id.*).

Burgos returned for an appointment with Catlin-Rakoski on December 5, 2012. (Tr. 318-21). According to Catlin-Rakoski, Burgos arrived on time for the appointment with an irritable mood and depressed affect. (*Id.*). As the session progressed, Burgos became more open and comfortable, although he continued to be vague. (*Id.*). Catlin-Rakoski noted that Burgos was being treated for PTSD symptoms, along with antisocial personality disorder and anger/aggression issues. (*Id.*). She noted that he was agitated, depressed, and irritable during the appointment, with a constricted affect. (*Id.*).

On December 19, 2012, Burgos attended another therapy session. (Tr. 314-17). Again, he arrived on time and demonstrated a depressed mood and congruent affect. (*Id.*). During the session, they discussed Burgos's interpersonal relationships and the affect of his mood on those relationships. (*Id.*). Burgos expressed a desire to live alone, but noted that he was not financially able to do so. (*Id.*). He reported that his financial condition caused him significant stress. (*Id.*).

Burgos returned for another session with Catlin-Rakoski on January 9, 2013. (Tr. 310-13). During the appointment, Burgos again presented with a depressed mood and congruent affect. (*Id.*). Burgos discussed his ongoing psychosocial stressors and how they affected his mood. (*Id.*).

On January 17, 2013, Prakash Reddy ("Reddy"), MD, conducted a psychiatric evaluation of Burgos. (Tr. 294-309). Reddy noted that he was familiar with Burgos, due to Burgos's unsuccessful participation in the chemical dependency clinic. (*Id.*). During the appointment, Burgos reported that he had been taking Seroquel, which was effective in reducing

the "voices." (*Id.*).  According to Burgos, he had been experiencing mood swings and the voices

that he heard were "arguing with each other." (*Id.*).  He also reported ongoing anger issues.

(*Id.*).  Burgos reported that he did not have any interests. (*Id.*).  He reported feelings of guilt and

worthlessness, and variable energy and concentration. (*Id.*).  Burgos indicated that his reading

and writing skills were at an approximate second or third grade level. (*Id.*).  According to

Burgos, he was often unable to read words on his eight-year-old stepchild's homework. (*Id.*).

In addition to the diagnoses assigned by Catlin-Rakoski, Reddy opined that

Burgos suffered from Bipolar Disorder, not otherwise specified, cocaine dependence and

cannabis dependence. (*Id.*).  He assessed a Global Assessment of Functioning ("GAF") of 50.

(*Id.*).  Reddy instructed Burgos to continue taking 200mg of Seroquel daily and also prescribed

Tegretol to address his mood swings and anger. (*Id.*).

On January 23, 2013, Burgos attended another therapy session with

Catlin-Rakoski. (Tr. 290-91).  Burgos, who was on time for the appointment, presented with an

irritable mood and congruent affect. (*Id.*).  He described ongoing arguments with his girlfriend

and indicated that he had decided to move into his own apartment. (*Id.*).  He expressed some

anxiety about living alone, but hoped that it would improve his relationship with his girlfriend.

(*Id.*).  He was scheduled to begin anger management group sessions on January 30, 2013. (*Id.*).

Burgos returned for another therapy session on February 7, 2013. (Tr. 286-87).

Again, Burgos presented with a depressed mood and irritable affect. (*Id.*).  During the

appointment, Burgos described ongoing conflict with his neighbor that had prompted repeated

police involvement, but no arrests. (*Id.*).  He continued to believe that it would be best if he

moved to his own apartment. (*Id.*).

Burgos did not attend another therapy session for several months until he returned on July 23, 2013, for an appointment with Catlin-Rakoski. (Tr. 282-83). Treatment notes suggest that Burgos had disengaged from treatment, but had returned seeking mental health treatment, and had also reengaged in chemical dependency treatment. (*Id.*). Burgos reported that he continued to use marijuana and wanted to refill his prescription to assist him in lessening his marijuana use. (*Id.*). According to Burgos, he had ended his relationship with his girlfriend and was living with his sister. (*Id.*). He reported ongoing financial stress and indicated that he was not receiving assistance from the Department of Social Services, although he believed he should have been. (*Id.*). According to Catlin-Rakoski, Burgos demonstrated a euthymic mood and congruent affect. (*Id.*). His mental status was otherwise normal. (*Id.*).

On August 6, 2013, Burgos returned for another therapy session. (Tr. 278-81). Burgos presented with a euthymic mood and congruent affect, and his mental status examination was otherwise normal. (*Id.*). Burgos recently had been involved in a verbal altercation with a staff member at the chemical dependency program. (*Id.*). According to Burgos, he believed that the staff member had disrespected him, causing Burgos to threaten the staff member. (*Id.*). Burgos seemed to recognize that his behavior was inappropriate. (*Id.*). He was advised that he had been discharged from the chemical dependency program and would never be permitted to return to the program. (*Id.*). According to Catlin-Rakoski, Burgos reacted well to this information and indicated that he wanted to focus on his mental health. (*Id.*).

Burgos attended additional appointments on August 20, September 3, and September 26, 2013. (Tr. 266-77). During each of the appointments, Burgos arrived on time and demonstrated an essentially normal mental status examination with a euthymic mood and congruent affect. (*Id.*). During the appointments, he discussed his financial and living situation.

(*Id.*).  He indicated that he was responding well to therapy and that he was looking for employment and his own place to live.  (*Id.*).  Burgos explained that he associated his feelings of worthlessness to his financial situation and lack of employment.  (*Id.*).  He continued to live with his sister, but felt that he was a burden to her.  (*Id.*).  He reported that he was feeling well and "doing great on his current medication regimen."  (*Id.*).  Burgos failed to attend any additional appointments and was ultimately discharged from treatment.  (Tr. 253-65).

### C.   <u>Medical Opinion Evidence</u>

#### 1.   <u>Kavitha Finnity, PhD</u>

On February 25, 2013, state examiner Kavitha Finnity ("Finnity"), PhD, conducted a consultative psychiatric evaluation of Burgos.  (Tr. 244-45).  Burgos reported that he lived with his girlfriend and sometimes stayed at his sister's residence.  (*Id.*).  Burgos reported he attended school until sixth grade and was currently unemployed.  (*Id.*).  He reported previous employment as a dishwasher.  (*Id.*).

Burgos reported that he had previously been hospitalized while he was incarcerated and was currently receiving mental health treatment, including psychotherapy and medication management.  (*Id.*).  According to Burgos, he had been arrested in 1997 for assault in the first degree and had served approximately nine years in prison.  (*Id.*).  He reported a history of cocaine abuse, but that he had not used cocaine in two years.  (*Id.*).  He also reported current, occasional marijuana use.  (*Id.*).

According to Burgos, he had no difficulties sleeping and had a normal appetite.  (*Id.*).  Burgos reported depressive symptoms, including a dysphoric mood, hopelessness, social withdrawal, and loss of energy.  (*Id.*).  Burgos also reported auditory and visual hallucinations, feelings of paranoia, and delusional thought patterns.  (*Id.*).  Burgos indicated that he was able to

care for his personal hygiene, cook, clean, do laundry, and shop.  (*Id.*).  Burgos also reported that he did not socialize, but had a good relationship with his family and enjoyed spending time with his dog.  (*Id.*).

Upon examination, Finnity noted that Burgos appeared appropriately dressed and well-groomed, with normal motor behavior, posture, and eye contact.  (*Id.*).  Finnity opined that Burgos had fluent, clear speech with adequate language, coherent and goal-directed thought processes, depressed affect, dysthymic mood, clear sensorium, full orientation, and below-average intellectual functioning with a general fund of information appropriate to his experience.  (*Id.*).  Finnity observed that Burgos's attention and concentration were mildly impaired, noting that Burgos had difficulty completing the serial threes.  (*Id.*).  Finnity found Burgos's recent and remote memory skills impaired.  (*Id.*).  According to Finnity, Burgos recalled three out of three objects immediately and zero out of three objects after five minutes, and he completed four digits forward and zero backward.  (*Id.*).

According to Finnity, Burgos can follow and understand simple directions, perform simple tasks, maintain attention and concentration, learn new tasks, perform complex tasks, and make appropriate decisions.  (*Id.*).  Finnity opined that Burgos was unable to maintain a regular schedule and had difficulty relating to others and dealing with stress due to psychiatric symptoms.  (*Id.*).  Finnity opined that the results of her examination appeared to be consistent with psychiatric symptoms that interfere with Burgos's ability to function on a daily basis.  (*Id.*).  She assessed that Burgos suffered from depressive disorder, not otherwise specified, and schizophrenia, paranoid type.  (*Id.*).  According to Finnity, Burgos would need assistance to manage his funds, and his prognosis was fair with continued psychological and psychiatric treatment.  (*Id.*).

2.      **L. Blackwell, Psychology**

On March 20, 2013, agency medical consultant Dr. L. Blackwell ("Blackwell")
completed a Psychiatric Review Technique.  (Tr. 78-79).  Blackwell concluded that Burgos's
mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Blackwell,
Burgos suffered from mild limitations in his activities of daily living and his ability to maintain
concentration, persistence, or pace, and moderate limitations in his ability to maintain social
functioning.  (*Id.*).  In addition, according to Blackwell, Burgos had not suffered from repeated
episodes of deterioration.  (*Id.*).  Blackwell completed a mental Residual Functional Capacity
("RFC") assessment.  (Tr. 80-82).  Blackwell opined that Burgos suffered from moderate
limitations in his ability to maintain attention and concentration for extended periods, work in
coordination with or in proximity to others without being distracted by them, complete a normal
workday and workweek without interruptions from psychologically-based symptoms and
perform at a consistent pace without an unreasonable number and length of rest periods, interact
appropriately with the general public, accept instructions and respond appropriately to criticism
from supervisors, get along with coworkers or peers without distracting them or exhibiting
behavioral extremes, and respond appropriately to changes in a work setting.  (*Id.*).  Blackwell
opined that Burgos was capable of sustaining substantial gainful employment, although he would
"perform best in a setting that does not require much social interaction."  (*Id.*).

### III.   <u>Non-Medical Evidence</u>

#### A.   <u>Application for Benefits</u>

In his application for benefits, Burgos reported that he had been born in 1980. (Tr. 156).  According to Burgos, he had previously been employed as a dishwasher and a delivery person.  (Tr. 159).

He lived with family and friends and did not care for any family members or pets. (Tr. 177-78).  Burgos indicated that he was sometimes too sad to care for personal hygiene and was unable to prepare meals because he could not read and did not know how to use a stove. (Tr. 178-79).  He generally relied on others for meals, although he was able to prepare microwave meals.  (Tr. 180).  He also indicated that he needed reminders to take his medication. (*Id.*).  According to Burgos, he was able to complete household chores, such as dishes and mopping, but required supervision to ensure that he properly completed his chores.  (Tr. 179).

Burgos reported that he had difficulty sleeping when not taking his medication and did not like to leave his house due to thoughts of others harming him.  (Tr. 178-79). According to Burgos, he only left his house to attend medical appointments.  (Tr. 179-80).  He did not have a driver's license and usually walked to his appointments.  (*Id.*).  According to Burgos, his inability to read or write prevented him from taking the test to obtain his driver's license.  (*Id.*).

Burgos reported that he did not shop, pay bills, or manage a savings account, although he was able to count change.  (Tr. 181).  According to Burgos, he watched television, although the news sometimes scared him.  (*Id.*).  Burgos reported that he only spent time with his family and did not feel comfortable around other people.  (Tr. 182).  According to Burgos, he

always felt as though other people were talking about him and he only left his house to attend appointments.  (*Id.*).

Burgos reported that he sometimes "s[aw] things" and he heard voices.  (Tr. 183). He reported that he had difficulty paying attention or finishing tasks, due to the voices. (Tr. 184).  According to Burgos, he was able to follow spoken instructions, if they were provided slowly, but was unable to follow written instructions because he could not read.  (*Id.*).  He also reported difficulty getting along with others, including people in positions of authority.  (*Id.*). Burgos indicated that he also had difficulty with his memory and adapting to changes and managing stress.  (Tr. 185).

### B.   <u>Administrative Hearing Testimony</u>

During the administrative hearing, Burgos testified that he was thirty-four years old.  (Tr. 50).  Burgos lived alone in an apartment above the restaurant where he was employed. (*Id.*).  According to Burgos, he had been employed for the previous four or five months, working five days a week preparing salads.  (Tr. 50-52).  Burgos was scheduled to work from 8:30 a.m. to 3:30 p.m.  (Tr. 53).  When he arrived at work in the morning, Burgos was provided instructions from the head chef.  (*Id.*).  He testified that he did not do any cooking, but only assisted with "prep work."  (Tr. 54).  During his shift, Burgos typically worked in the kitchen with approximately four or five other people, including the chef.  (Tr. 61-62).  Burgos did not interact with customers.  (Tr. 62).

Burgos expressed that he was "lucky" to have obtained his current job.  (Tr. 60). Burgos testified that the restaurant was owned by a family who had hired him despite his educational deficits and who had made the employment "comfortable" for him.  (Tr. 60-61).

Burgos testified he was able to get along with his boss and coworkers "on and off," although he argued all the time.  (Tr. 61).  According to Burgos, his employers were lenient with him.  (*Id.*).

Burgos testified that he had previous work experience as a dishwasher and a delivery person.  (Tr. 55).  According to Burgos, he had been terminated from those positions due to "attitude problems" and his lack of education.  (Tr. 58).  Burgos testified that he has significant difficulty reading and estimated that his skills were at a first or second grade level.  (*Id.*).  Burgos testified that he stopped going to school in the sixth grade due to his imprisonment.  (Tr. 59).  Although he was provided educational instruction in prison, Burgos did not progress and had never obtained his GED.  (Tr. 65-66).

Burgos testified that he had received mental health treatment at Evelyn Brandon Health Center "on and off" for the previous two years, but had been unable to afford treatment after he began working.  (Tr. 60).  Burgos believed that the treatment had been helpful.  (*Id.*).  According to Burgos, he has difficulty being around people and spends the majority of his non-working time in his apartment.  (Tr. 63).

Burgos testified that he does not grocery shop and typically eats meals at the restaurant where he was employed.  (Tr. 64).  He does not have a driver's license and usually walks, although he sometimes uses public transportation.  (Tr. 65).  Burgos testified that, although he knows many people in the area, he no longer associates with people from his past.  (*Id.*).  According to Burgos, he is able to maintain his apartment without assistance, and his sister washes his laundry.  (Tr. 66-67).

Vocational expert, Peter Manzi ("Manzi"), also testified during the hearing.  (Tr. 67-74).  The ALJ first asked Manzi to characterize Burgos's current employment.  (Tr. 68).  According to Manzi, Burgos was currently employed as a cook helper.  (*Id.*).

16

The ALJ asked Manzi whether a person would be able to perform Burgos's current position who was the same age as Burgos, with the same education and vocational profile, who was able to perform the full range of work at all exertional levels, but who was limited to having only occasional interaction with coworkers and none with the general public. (Tr. 68-69). Manzi testified that such an individual would be able to perform Burgos's current employment and would be able to perform other positions in the national economy, including hand packager and laundry worker. (*Id.*).

The ALJ asked Manzi whether a person would be able to perform work that existed in the national economy who was the same age as Burgos, with the same education and vocational profile, who was able to perform the full range of work at all exertional levels, but who was limited to having no contact with coworkers and the general public and only occasional contact with supervisors. (Tr. 69). Manzi testified that such an individual would be able to unable to sustain employment. (*Id.*).

The ALJ asked Manzi whether a person would be able to perform work that existed in the national economy who was the same age as Burgos, with the same education and vocational profile, who was able to perform the full range of work at all exertional levels, but who was limited to having only occasional interaction with coworkers and none with the general public, and would be off-task approximately twenty percent of the workday. (*Id.*). Manzi testified that such an individual would be unable to maintain employment. (*Id.*).

Burgos's attorney asked Manzi to identify the reasoning level for the hand packager and laundry worker positions. (Tr. 70). Manzi testified that both positions required a reasoning level of two, which was consistent with simple unskilled work. (*Id.*). Burgos's attorney also asked whether a reasoning level of two was consistent with someone who had a

marginal education. (*Id.*). Manzi testified that it would depend upon the individual's

functioning. (*Id.*). With respect to literacy, Manzi testified that both positions required a

language development of one, which was the lowest level. (*Id.*).

Burgos's attorney then asked Manzi whether a person would be able to perform

work that existed in the national economy who was the same age as Burgos, with the same

education and vocational profile, who needed to take brief, unscheduled breaks throughout the

workday such that they would be off-task approximately twenty percent of the workday.

(Tr. 70-71). Manzi testified that such an individual would be unable to maintain employment.

(*Id.*).

Burgos's attorney asked Manzi whether an individual would be considered to be

receiving a work accommodation who was performing work with a specific vocational

preparation ("SVP") of two or less, but needed instructions and additional supervision to perform

his duties. (Tr. 71). Manzi testified that such work would be considered "sheltered or supported

employment" in most, but not all, situations. (*Id.*).

## C.   **Employer-Submitted Information**

On September 18, 2014, Michele Yancey ("Yancey"), the owner of the restaurant

that employed Burgos, completed an employer questionnaire. (Tr. 154-55). Yancey indicated

that Burgos was provided fewer or easier duties, extra help, and more rest periods than other

employees due to his reading difficulties and mood swings. (*Id.*). She reported that Burgos was

not hired due to any family relationship or other special reason and that she did not own

Burgos's apartment. (*Id.*). According to Yancey, Burgos occasionally had difficulty handling

anger and controversy with his coworkers and relating to the general public. (*Id.*). Burgos

generally kept to himself while at work. (*Id.*). Yancey reported that Burgos required additional

training due to his reading barrier and moodiness, but did not have any difficulty following directions or maintaining attention and concentration.  (*Id.*).

According to Yancey, Burgos occasionally experienced difficulty managing pace or stress and sometimes needed additional breaks or rest periods to recompose himself during stressful periods.  (*Id.*).  Yancey reported that Burgos required special assistance from his coworkers to complete his tasks and was assigned work that was suited to his impairments, but that he was not permitted to work at a lower standard of productivity or efficiency than his coworkers.  (*Id.*).  Yancey reported that Burgos was not frequently absent from work and that he had quit on one occasion.  (*Id.*).

## DISCUSSION

## I.    Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

      To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.

Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

      A person is disabled if he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  In assessing whether

a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v.

Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

    (1)    whether the claimant is currently engaged in substantial
           gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.     The ALJ's Decision

         In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 32-41).  Under step one of the process, the ALJ found that Burgos has not

engaged in substantial gainful activity since November 19, 2012, the application date.  (Tr. 32).

The ALJ noted that Burgos was employed at a level that was likely approaching substantial

gainful employment, but he determined, for the purposes of the hearing, that Burgos was not

engaged in substantial gainful activity.  (*Id.*).  At step two, the ALJ concluded that Burgos has

the severe impairments of bipolar/depressive disorder, PTSD, and antisocial personality disorder.

(*Id.*).  The ALJ determined that Burgos's schizophrenia (or similar psychotic disorder) was not

medically determinable because the record did not contain a diagnosis by an acceptable medical

source.  (Tr. 32-34).  The ALJ also determined that the record did not warrant a finding that

Burgos was illiterate.  (Tr. 34).  At step three, the ALJ determined that Burgos does not have an

impairment (or combination of impairments) that meets or medically equals one of the listed

impairments.  (Tr. 34-37).  With respect to Burgos's mental impairments, the ALJ found that

Burgos suffers from moderate difficulties in social functioning, and mild limitations in activities

of daily living and maintaining concentration, persistence, or pace.  (*Id.*).  The ALJ concluded

that Burgos has the RFC to perform the full range of work at all exertional levels, but is limited

to occasional interaction with coworkers and no interaction with the general public.  (Tr. 37-40).

At step four, the ALJ determined that Burgos does not have any past relevant work.  (Tr. 40).

Finally, at step five, the ALJ concluded that Burgos could perform other jobs in the local and

national economy, including hand packager, laundry worker II, and cook helper.  (Tr. 40-41).

Accordingly, the ALJ found that Burgos is not disabled.  (*Id.*).

> **B.**     **Burgos's Contentions**

Burgos contends that the ALJ's mental RFC determination is not supported by

substantial evidence and is the product of legal error.  (Docket ## 11-1, 16).  First, Burgos

maintains that the ALJ improperly rejected the most limiting portion of Finnity's opinion.

(Docket ## 11-1 at 13-16; 16 at 1-3).  Next, Burgos maintains that the ALJ's RFC is not

supported by substantial evidence because he relied upon impermissibly vague medical opinions.

(Docket ## 11-1 at 16-20; 16 at 3-5).  Finally, Burgos maintains that the ALJ mischaracterized

the medical record, demonstrating an impermissible bias.  (Docket # 11-1 at 20-24).

## II.     **Analysis**

### A.     **RFC Assessment**

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Burgos contends that the ALJ erred by rejecting Finnity's opinion that he was unable to maintain a regular schedule.  (Docket ## 11-1 at 13-16; 16 at 1-3).  Further, Burgos maintains that Finnity's and Blackwell's opinions regarding his ability to interact with others were impermissibly vague.  (Docket ## 11-1 at 16-20; 16 at 3-5).

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)).  In evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

    (1)     the frequency of examination and length, nature, and extent
            of the treatment relationship;

    (2)     the evidence in support of the physician's opinion;

      (3)      the consistency of the opinion with the record as a whole;

      (4)      whether the opinion is from a specialist; and

      (5)      whatever other factors tend to support or contradict the
              opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(f), *redesignated*

§ 404.1527(e)); *House v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions,

regardless of the source are evaluated considering several factors outlined in 20 C.F.R.

§§ 404.1527(c), 416.927(c)").  "There is no requirement that the agency accept the opinion of a

consultative examiner concerning a claimant's limitations."  *Pellam v. Astrue*, 508 F. App'x 87,

89 (2d Cir. 2013).

      The ALJ thoroughly discussed Finnity's opinion in his decision and accorded it

great weight except for her opinion that Burgos was unable to maintain a regular schedule.

(Tr. 35, 36, 39).  With respect to that limitation, the ALJ found it inconsistent "with the

evidence," including Burgos's "current work regimen."  (Tr. 36, 39).  Burgos maintains that the

ALJ's conclusion that he was able to maintain a schedule was contradicted by the record,

particularly his employer's statement that he required unscheduled breaks throughout the

workday.  (Docket ## 11-1 at 13-16; 16 at 1-3).  I disagree.

      In his decision, the ALJ recounted in detail the findings of Finnity's examination,

including that Burgos exhibited some memory and attention and concentration limitations, but

noted that Finnity nonetheless concluded that Burgos was capable of learning simple and even

complex tasks, making appropriate decisions, and maintaining concentration without significant

difficulty.  (Tr. 36, 39).  The ALJ also recognized that Finnity opined that Burgos would have

some difficulty interacting with others and dealing with stress, which he accounted for in his RFC by limiting Burgos to work that did not involve interaction with the general public or more than occasional interaction with coworkers.  (Tr. 39).

With respect to Finnity's conclusion that Burgos was unable to maintain a schedule, the ALJ found that this limitation was not consistent with the record evidence, particularly Burgos's current work regimen.  (Tr. 36-37, 39).  In reaching this conclusion, the ALJ discussed at length Burgos's current work, including Yancey's report of Burgos's work-related capabilities.  (Tr. 35-36).  For instance, the ALJ noted that Yancey reported that Burgos was provided extra training, given lighter duties due to his reading difficulties, and limited to work involving no interaction with the general public given his anger issues.  (Tr. 35). Contrary to Burgos's assertions (Docket # 16 at 3), the ALJ explicitly recognized that Burgos occasionally took additional breaks when overwhelmed.  (Tr. 35).  The ALJ further noted that, despite these breaks, Burgos maintained an acceptable level of productivity and efficiency, as well as concentration and attention, and did not have excessive absences.  (Tr. 35-36).

The ALJ further noted that Burgos's ability to work at a "near fulltime schedule" and to live independently, coupled with his more recent treatment notes that demonstrated minimal objective findings, contradicted Burgos's allegations of significant limitations in completing daily activities.[4]  (Tr. 36).  Accordingly, the ALJ concluded that Finnity's opinion regarding Burgos's inability to maintain a schedule, which was issued at a time when Burgos was not employed or living independently, was not supported by the more recent evidence in the record, particularly Burgos's ability to attend work five days a week without excessive absences.

---

[4]  I disagree with Burgos to the extent that he maintains that the only reason for the ALJ's rejection of Finnity's schedule-related limitation was that it was inconsistent with Burgos's work regimen.  (Docket # 16 at 1-2). Rather, the ALJ found the limitation to be inconsistent with the record evidence, which he summarized in his discussion of Finnity's schedule-related opinion, "especially the current evidence which confirms that he is able to maintain his current work schedule."  (Tr. 36-37).

(Tr. 36-37, 39).  I conclude that the ALJ did not improperly reject the schedule-related

limitations assessed by Finnity for these reasons.  *See Harrington v. Colvin*, 2015 WL 790756,

*16 (W.D.N.Y. 2015) (ALJ properly discounted treating physician opinion where it assessed

limitations that were inconsistent with findings contained in the treatment records and with

admissions claimant had made concerning his activities of daily living); *Wilferth v. Colvin*, 49

F. Supp. 3d 359, 362 (W.D.N.Y. 2014) (ALJ properly weighed treating physician opinion and

"adequately explained her reasons for declining to grant controlling weight to his conclusion"

where opinion was "inconsistent with other opinions in the record, as well as statements made by

the plaintiff himself, and none of the objective test records . . . indicate[d] a level of disability

greater than that reflected in the plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*,

2008 WL 4411655, *5 (N.D.N.Y. 2008) (ALJ properly discounted opinion of treating physician

where it was inconsistent with treatment records and objective findings of the consultative

examiner).

        For similar reasons, I reject any suggestion that the ALJ's determination to reject

Finnity's schedule-related limitation was improper "cherry-picking."  (Docket # 16 at 1).  "[T]he

record demonstrates that the [ALJ] carefully reviewed the entire record . . . and declined to adopt

those [limitations] that were unsupported."  *See Cosme v. Colvin*, 2016 WL 4154280, *12

(W.D.N.Y. 2016) (rejecting argument that ALJ inappropriately adopted only those limitations

that supported his ultimate finding where decision demonstrated that ALJ carefully considered

conflicting evidence and provided basis for decision to adopt only portions of medical opinion).

        Next, Burgos argues that the social interaction limitations assessed by the ALJ are

not supported by any medical opinion of record.  (Docket ## 11-1 at 16-20; 16 at 3-5).

According to Burgos, Finnity's opinion assessing that he had "difficulty relating with others"

(Tr. 246), and Blackwell's opinion that he "might perform best in a setting that does not require much social interaction" (Tr. 82), were simply too vague to support the ALJ's RFC assessment. (*Id.*).

As an initial matter, although an expert opinion may describe a claimant's impairments in terms that are so vague as to render the opinion useless, *see Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), the use of imprecise phrases by a consultative examiner does not automatically render an opinion impermissibly vague. *See Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014) (collecting cases). Instead, when a consulting opinion is otherwise supported by clinical findings, an examination of the claimant, or other objective evidence in the record, the opinion "can serve as an adequate basis for the ALJ's ultimate conclusion." *Dier v. Colvin*, 2014 WL 2931400, *4 (W.D.N.Y. 2014) (internal quotation omitted).

In this case, Finnity provided her assessment after conducting a thorough evaluation of Burgos. During the examination, Finnity noted that Burgos was cooperative, spoke clearly with adequate language, demonstrated coherent thought processes, and full orientation. (Tr. 244-46). Finnity also noted that Burgos was depressed and demonstrated below-average cognitive functioning. (*Id.*). Finnity required Burgos to engage in activities to assess his memory and concentration and determined that both were impaired. (*Id.*). Finnity also considered Burgos's reports of daily activities, including his ability to perform basic hygiene and household chores, but noted that he did not socialize outside of his family. (*Id.*). Additionally, Finnity considered Burgos's reports of symptoms, including social withdrawal and paranoia. (*Id.*). Based upon these findings, Finnity assessed that Burgos was generally capable of performing work-related functions, but would have difficulty relating with others. (*Id.*).

As recognized by the ALJ, Finnity's assessment of some social-interaction limitations is supported by other objective evidence in the record, including Burgos's ability to perform work-related tasks, which did not involve interactions with the public, in the presence of coworkers at his current job. It is also supported by Burgos's testimony that he generally isolated himself, but was able follow directions and work in the presence of others. (Tr. 53, 61-62). In sum, Finnity's opinion as to Burgos's limitations was well-supported by her psychiatric evaluation examination and other objective medical evidence in the record, and I conclude that the ALJ properly relied upon Finnity's opinion to support his RFC assessment. *See Collier v. Colvin*, 2016 WL 4400313, *3 (W.D.N.Y. 2016) (consulting physician's assessment of "moderate" limitations "was not so vague as to render it useless in evaluating [plaintiff's] ability to perform light work" where it was supported by "an objective physical examination" of the plaintiff") (internal quotations omitted); *Hanson v. Comm'r of Soc. Sec.*, 2016 WL 3960486, *8-9 (N.D.N.Y.) ("[a]lthough a consultative examiner's opinion may use terminology that, on its face, is vague, such language does not render the consultative examiner's opinion useless in all situations[;] . . . [h]ere, [the consultative examiner's] opinion was not impermissibly vague because he made specific findings on his physical examination and his limitation was supported by other objective evidence in the record") (collecting cases), *report and recommendation adopted*, 2016 WL 3951150 (N.D.N.Y. 2016); *Johnson v. Colvin*, 2015 WL 1300017, *12 (W.D.N.Y. 2015) (ALJ properly relied upon consultative opinion assessing "some limitations" where opinion was supported by physician's physical examination); *Hoffman v. Comm'r of Soc. Sec.*, 2014 WL 6610059, *4 (N.D.N.Y. 2014) (consultative opinion not impermissibly vague where it was "well supported by [the physician's] extensive examination[,] . . . [was] not in any way conclusory[ and] . . . was also consistent with the other evidence in the

record"). Similarly, Blackwell's opinion, which was consistent with and supported by Finnity's evaluation and other objective medical evidence in the record, was likewise properly relied upon by the ALJ.

The thrust of Burgos's argument is that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ was not capable of translating Finnity's and Blackwell's opinions, which suggested that Burgos had difficulty interacting with others in the workplace, into a specific RFC finding that Burgos was capable of interacting with supervisors and occasionally interacting with coworkers, but not capable of interacting with the general public. (Docket ## 11-1 at 16-20 & n.1; 13 at 1-3). I disagree.

The ALJ formulated the RFC by relying upon the opinions provided by Finnity and Blackwell, which, as discussed above, were well-supported by Finnity's psychiatric evaluation and other objective evidence contained in the record, along with his careful review of the medical record and Burgos's testimony. Burgos testified that he was provided directions daily from the kitchen chef, thus suggesting that he was able to interact with supervisors. (Tr. 53-54). Further, as recognized by the ALJ, Burgos testified that he was "able to tolerate the presence of others in the kitchen, and he was able to accept instructions from other workers as he learned his duties." (Tr. 36). This testimony supports the ALJ's conclusion that Burgos was capable of occasional interaction with his coworkers. Accordingly, the ALJ's RFC assessment is adequately supported by the record, including Burgos's own testimony concerning his abilities. Although Burgos argues that Finnity's and Blackwell's opinions were too imprecise to support the ALJ's RFC determination, I disagree for the reasons stated above, and I find no legal error in the ALJ's RFC assessment.

In conclusion, I find that the ALJ's RFC assessment was supported by substantial evidence. The record reflects that Burgos has suffered from mental impairments for the majority of his life. Burgos has sought psychotherapy treatment sporadically, although the record suggests he has received more consistent medication treatment for his impairments. (Tr. 24). In fact, Burgos stated that his hallucinations were infrequent while on medication, and the treatment records demonstrate general improvement with therapy. (Tr. 218, 266-83).

Burgos is now living independently and, although he testified that he does not cook, shop, or do laundry, he reported to Finnity that he was able to perform those tasks. Further, nothing in Burgos's work history suggests that he is unable to perform work as long as his interactions with others are limited. Although Burgos testified that he argues with his coworkers, and his employer indicated that he requires breaks to recompose himself, the evidence demonstrates that he is able to work five days a week and is able to maintain attention, concentration, and productivity during the workdays. On this record, I conclude that the ALJ's RFC assessment was reasonable and supported by substantial evidence. *Pellam v. Astrue*, 508 F. App'x at 90-91.

**B.    Characterization of the Record**

Finally, I turn to Burgos's contention that the ALJ mischaracterized the record in several respects which, in combination, reveal that the ALJ was biased. (Docket ## 11-1 at 20-24). Having carefully reviewed the record, I reject this contention entirely.

"[D]ue process requires that [an] ALJ[] be impartial and unbiased during administrative proceedings." *Pabon v. Comm'r of Soc. Sec.*, 2015 WL 4620047, *5 (S.D.N.Y.) (citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982)), *report and recommendation adopted*, 2015 WL 5319265 (S.D.N.Y. 2015). Indeed, a presumption exists that ALJs are

unbiased and "exercise their decision-making authority with honesty and integrity." *Id.* "A claimant alleging the denial of a fair hearing . . . bears the burden of showing a 'conflict of interest or some other specific reason for disqualification.'" *Id.* (quoting *Schweiker v. McClure*, 456 U.S. at 195). The basis for the disqualification must be clear from the record and "cannot be based on speculation or inference," *Card v. Astrue*, 752 F. Supp. 2d 190, 191 (D. Conn. 2010), and a claimant alleging bias "faces a difficult burden," *Pabon v. Comm'r of Soc. Sec.*, 2015 WL 4620047 at *5.

First, Burgos maintains that the ALJ's characterization of his auditory hallucinations as "rare" occurrences demonstrates that the ALJ improperly diminished the severity of this impairment. (Docket # 11-1 at 21). According to Burgos, the record demonstrates that he "occasionally," not "rarely," heard voices that commanded him to harm himself or others. (*Id.*). Having reviewed the record and the ALJ's decision, I find no support for Burgos's contention that the ALJ failed to appreciate the alleged severity of Burgos's auditory hallucinations. The medical records suggest that Burgos reported nearly daily hallucinations when not taking his medication, but much less frequent hallucinations when he was. (Tr. 217). According to Burgos, on medication, he does not hear voices "regularly," but hears them "occasionally" – approximately once every two months – when he is very stressed. (Tr. 217-18, 229). In his decision, the ALJ recognized that Burgos reported experiencing "occasional hallucinations," which occurred only rarely when he was taking his medication. (Tr. 32). This characterization is not inconsistent with the record.

Next, Burgos maintains that the ALJ mischaracterized his treatments notes between October 2012 and December 2012. (Docket # 11-1 at 21-22). Burgos argues that the ALJ inaccurately noted that those records suggested that Burgos "did not exhibit abnormalities

of thought or perception, disorganized behavior, or obvious cognitive deficits of the sort which would correlate with serious functional deficits." (*Id.*).  According to Burgos, the treatment notes actually show that he endorsed feelings of guilt, hopelessness, and worthlessness, and that he reported seeing shadows, hearing voices, and experiencing paranoia.  (*Id.* at 22).

In his decision, the ALJ noted that Burgos alleged significant mental impairments, including recurrent psychotic symptoms involving hallucinations and paranoia.  (Tr. 38).  The ALJ summarized Burgos's treatment history, noting that he did not exhibit significant symptoms involving hallucinations or paranoia, even during his early appointments.  (*Id.*).  Although the ALJ recognized that Burgos demonstrated irritability and anxiety, he also stated that Burgos's mental status examinations did not suggest significant cognitive or perceptual disturbances due to his hallucinations and paranoia.  (*Id.*).  That the ALJ's summary of the treatment notes did not recite every symptom exhibited by Burgos does not render it inaccurate or warrant remand.

Burgos also maintains that the ALJ's recitation improperly suggested that his employer provided additional assistance to Burgos only temporarily during training.  (Docket # 11-1 at 22).  I do not concur in Burgos's interpretation of the decision.  Although the ALJ recognized that Burgos received extra training during his first few months of his employment (Tr. 38), nothing in the decision suggests that he believed that the other considerations provided by the employer were temporary in nature.  Indeed, the ALJ's decision demonstrates that he fully appreciated that Burgos was provided lighter duties, work without contact with the public, and occasional additional breaks.  (Tr. 35).

Finally, Burgos maintains that the ALJ's statement that Burgos continues to "struggle somewhat with his difficulties interacting with others" suggests that the ALJ failed to appreciate Burgos's limitations in this area of functioning.  (Docket # 11-1 at 23).  According to

Burgos, the ALJ overlooked record evidence that suggested that he kept to himself, took unscheduled breaks, and argued with his coworkers.  Again, I disagree.  The ALJ discussed at length both Burgos's allegations of debilitating inability to interact with others and the record evidence that the ALJ found to be inconsistent with those allegations.  (Tr. 35-36).

The ALJ's decision reflects that he carefully reviewed, considered, and weighed the conflicting evidence and fully explained the conclusions that he reached and the bases for them.  Allegations of bias are serious challenges and should not be trivially made.  Here, Burgos suggests that the ALJ improperly considered his criminal history in determining that he was not disabled.  There is absolutely nothing in the decision to support that contention.  In sum, I reject Burgos's argument that the ALJ was improperly biased against him or that he did not receive a full and fair determination during the administrative process.

## **CONCLUSION**

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **GRANTED**.  Burgos's motion for judgment on the pleadings **(Docket # 11)** is **DENIED**, and Burgos's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       September 30, 2016

33